443 F.2d 452
 HI-RIDGE LUMBER COMPANY, a corporation, Plaintiff-Appellant,
v.
UNITED STATES of America, Orville Freeman, Secretary of
Agriculature, and Employees of the United States
Department of Agriculture, Defendants-Appellees.
 No. 24344.
 United States Court of Appeals, Ninth Circuit.
 May 28, 1971, Rehearing Denied June 29, 1971.
 
 Michael T. Hennessy (argued), Yreka, Cal., for plaintiff-appellant.
 Michael C. Farrow, Asst. U.S. Atty., (argued), Dwayne Keyes, U.S. Atty., Sacramento, Cal., William D. Ruckelshaus, Asst. Atty. Gen., Alan S. Rosenthal, Walter H. Fleischer, Attys., Dept. of Justice, Washington, D.C., for defendants-appellees.
 Before BARNS and DUNIWAY, Circuit Judges, and GRAY, District Judge.*
 BARNES, Circuit Judge:
 
 
 1
 Appellant, Hi-Ridge Lumber Company (hereinafter Hi-Ridge), appeals from an entry by the district court of a summary judgment granted in favor of the United States and other defendants. That action was commenced by Hi-Ridge under authority of 28 U.S.C. Section 1361, seeking an order in the nature of mandamus to compel the United States Forest Service to award appellant a contract for sale of timber in the Rogue River National Forest. Our jurisdiction rests upon 28 U.S.C. Section 1291.
 
 
 2
 This controversy arose from an auction sale held by the Forest Service on June 26, 1963, at which Hi-Ridge Submitted the high bid. Appellant asserts that immediately upon the conclusion of the oral bidding, the representative of the Pacific Northwest Regional Forester who conducted the auction made an 'informal' award of the contract to it.
 
 
 3
 Prior to the bidding, information was provided to prospective bidders which contained the terms of sale and contract requirements. The right to reject any and all bids was specifically reserved. (C.T. 35)
 
 
 4
 The affidavits reveal that after the oral bidding on a timber sale of this nature, the apparent high bidder is asked to fill out a confirmation bid form (C.T. 40-41), which is sent to the Regional Forester's office. If the bid is approved, the Regional Forester or the Assistant Regional Forester to whom this authority has been delegated awards the sale by signing a memorandum to the Forest Supervisor, informing him that the sale is awarded to the successful bidder as of the date stated in the memorandum. The Supervisor then notifies the successful bidder by certified mail, and asks him to sign the necessary contract forms. After those forms are properly executed, the Regional Forester or his delegate signs the contract on behalf of the United States. (C.T. 39)
 
 
 5
 Soon after the bidding ended, a controversy arose as to the duty of the party awarded the contract to build roads. The advertised sample contract provided that 10.7 miles of road were to be constructed, of which 1.8 miles were outside and north of the sale area. Hi-Ridge took the position that its plan to haul the timber south to its plant rendered the 1.8 mile northern road segment unnecessary and therefore not required by the contract. Because of this, the contract award was withheld and discussed with higher Forest Service officials. The latter notified Hi-Ridge that the 1.8 mile road segment requirement could be deleted only if compensating road work were done, or the price was adjusted. When Hi-Ridge refused and adhered to its position, the matter was submitted to the Chief of the Forest Service with the recommendation that all bids be rejected and the sale readvertised.[1]
 
 
 6
 In July of 1963, the Chief advised the Regional Forester that all bids were to be rejected and the timber again offered for sale. After Hi-Ridge was notified that all bids were rejected, it requested that the Chief of the Forest Service reconsider his decision. On Jule 8, 1964, the Chief reversed his decision that all bids were to be rejected, and concluded that the contract should be awarded to Hi-Ridge. In his new ruling, the Chief noted that in light of the previously unconsidered possibility of hauling the timber to the south instead of the north, the contract terms offered became somewhat ambiguous. Because of the risk that a reoffering might not result in a contract financially more favorable to the government, he believed that the appraisal oversight justified overriding in this case the policy that a purchaser would have to build substitute roads or agree to a price revision in lieu of building roads he would not use.
 
 
 7
 The Double Dee Lumber Company, second highest bidder at the auction appealed to the Secretary of Agriculture according to the then applicable regulation (36 C.F.R. 211.2) (1960 ed.)). In December of 1965, the Secretary reversed the Chief of the Forest Service and decided that all bids must be rejected. His decision was based on a ruling by the Comptroller General that issuance of a road construction modification is improper in a case such as this.
 
 
 8
 I. Judicial Reviewability Generally.
 
 
 9
 The actions of the Forest Service officials in conducting the sale were taken under the provisions of 36 C.F.R. Section 221.10 which in relevant part provided as follows:
 
 
 10
 'Awards of Advertised Timber. (a) Advertised timber will be awarded to the highest bidder upon satisfactory showing by him of ability to meet financial requirements and any other conditions of the sale offer unless:
 
 
 11
 '(1) Determination is made to reject all bids.
 
 
 12
 '(c) If the highest bid is not accepted and the sale is still deemed desirable, all bids may be rejected and the timber readvertised; or, if the highest bidder cannot meet the requirements under which the timber was advertised or the withholding of award to him is based on one or more of paragraphs 4, 5, and 6 above, award at the highest price bid may be offered to the next highest qualified bidders in order of their bids until the award is accepted by one or refused by all of the qualified bidders.'
 
 
 13
 The manual of the Forest Service further provided in Section 2431.7 that pursuant to Section 221.10 'all bids may be rejected only when such rejection is in the interest of the United States.'
 
 
 14
 A cursory reading of the regulations clearly reveals that their basic acheme calls for the exercise of discretion in carrying out government timber sales. In a Section 1361 action, we are called upon to determine whether a governmental officer has acted within the delegated scope of discretion. See Byse and Fiocca, 'Section 1361 of the Mandamus and Venue Act of 1962 and 'Nonstatutory' Judicial Review of Federal Administrative Action', 81 Harv.L.Rev. 308 (1967).
 
 
 15
 Before we may determine whether the Secretary's determination to reject all bids for the reasons stated was a permissible exercise of the discretion delegated to him, however, we must first consider the effect of Section 10 of the Administrative Procedure Act hereinafter ('Act'), 5 U.S.C. Section 701(a) (Supp. II, 1967) on the availability of review by this Court. Section 10 provides that the Act applies to provide review 'except to the extent that--* * * (2) agency action is committed to agency discretion by law.' Lacking specific legislative instruction as to the availability of judicial review, the court must balance the need for the speedy and efficient enforcement of Congressional programs and the growing demands on judicial resources against an individual's interest in having a claim adjudicated. See Saferstein, 'Nonreviewability: A Functional Analysis of 'Committed to Agency Discretion", 82 Harv.L.Rev. 367 (1968).
 
 
 16
 The test cannot simply be whether the agency possesses some discretion under the controlling law. As we said in Ferry v. Udall, 336 F.2d 706, 711 (9th Cir. 1964):
 
 
 17
 'We recognize the intrinsic difficulty in determining whether a discretionary action of an agency is reviewable. Almost every agency action involves some degree of discretion of judgment. Yet it cannot be said that, for this reason, every agency action is unreviewable. Homovich v. Chapman, 89 U.S.App.D.C. 150, 153, 191 F.2d 761, 764. The analytical problem is that of determining when the agency action is 'committed to agency discretion' within the meaning of section 10 of the Administrative Procedure Act, and when it merely 'involves' discretion which is nevertheless reviewable. 4 Davis, Administrative Law Treatise 28.16, pp. 80-81; Anno., Administrative Procedure Act, 97 L.Ed. 884, 889.'
 
 
 18
 More recently, the Supreme Court, in Association of Data Processing Service Organizations, Inc., v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), made clear the principle that judicial review may not be denied unless there is persuasive reason to believe that this was the intent of Congress in passing the statute. The relevant provision, 16 U.S.C. 476, readily provides such an inference. At length, it delegates to the Secretary power to provide rules and regulations to govern such sales as well as explicitly authorizing him to exercise his discretion in many instances. Section 476 as an example of his broad discretion specifically provides that 'In cases in which advertisement is had and no satisfactory bid is received, or in cases in which the bidder fails to complete the purchase, the timber may be sold, without further advertisement, at private sale, in the discretion of the Secretary of Agriculture, at not less than the appraised valuation, in quantities to suit purchasers'.
 
 
 19
 In determining reviewability we must also examine the regulations and investigate the nature and breadth of the discretion delegated to the Forest Service in the sale of timber. Under the regulations in effect, the Forest Service could 'reject all bids with or without reason.' S & S Logging Co. v. Barker, 366 F.2d 617 (9th Cir. 1966). Although there were requirements which had to be met before a contract could be awarded to the next highest bidder, there were none attached to a decision to reject all bids. The caveat in the manual (which does not rise to the status of a regulation) that such a rejection must be made 'only when in the interest of the United States' can be read to call for an informed managerial discretion. The only restriction upon the discretion to reject all bids is that this power should be invoked only in situations to benefit the government, rather than those private parties with whom its agents deal.
 
 
 20
 Our reading of the discretionary power relating to the rejection of all bids convinces us that several conpelling reasons exist to justify nonreview because the decision is committed to agency discretion. First, the authority delegated is quite broad. While we assume that the regulations provide sufficient guidelines to review a decision to award the contract to one who was not the highest bidder, we have no standards before us by which we could review the rejection of all bids. The development of such criteria and factors to be weighed would be too onerous a burden upon this or any court. Secondly, the decision whether to award a specific contract in view of the government's need for revenue, management of timber and its road-building needs, is one which is necessarily based upon some expertise in the financial and ecological management of our natural resources. This Court has neither the technical expertise nor the intuitive knowledge gained from daily acquaintance with this subject to provide an informed review of executive decision-making. Thirdly, the timber sale activities of the Forest Service are in the nature of a continuing and comprehensive managerial function. The decision in question reflects managerial policies which may be important to the overall program of the agency. Although we may be able to understand the basic issue of whether compensating consideration is required in lieu of unnecessary roadwork, it is likely that this policy is one of a complex group with which we are generally unfamiliar. Finally, our review of the facts assures us that the Forest Service appeals procedures provide a fair and expeditious forum in which dissatisfied participants in the bidding may lodge their protests and have them fully considered. What took place in this case confirms that view.
 
 
 21
 The analysis above clearly distinguishes the administrative scheme in this case from that presented in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), where the Supreme Court found the statute involved contained specific requirements to guide and control agency action.
 
 
 22
 These factors lead us to conclude that the Secretary's decision is within the ambits of those removed from judicial review on the merits by section 10 of the A.P.A. See Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958).
 
 
 23
 II. Exceptional Judicial Reviewability.
 
 
 24
 A limited area of review remains open, however.
 
 
 25
 'In special circumstances, the general rule concerning the unreviewability of agency action committed by law to agency discretion will be qualified to permit limited judicial review with respect to fundamental jurisdictional or constitutional issues, even in the face of a legislative intent to foreclose total review. See Davis, Administrative Law, 28.12-28.15. (1958) and cases cited therein; 2 Am.Jr.2d, Administrative Law, 565.' Hamel v. Nelson, 226 F.Supp. 96, 98 (N.D.Calif.1963).
 
 
 26
 Appellant asserts that Double Deelacked standing to appeal the second decision of the Chief of the Forest Service and that the Secretary's decision is therefore invalid. At the time in question, the appeals regulation, 36 C.F.R. 211.2 (1960 ed.), provided that any person 'aggrieved' by the decision of an officer of the Forest Service may appeal. The language has subsequently been changed to provide appeal for those 'adversely affected'. It is appellant's contention that the former standard is much more restricted than the latter and the term 'aggrieved' has the same meaning in this regulation as in several cases dealing with jurisdiction to sue. The district court characterized these assertions an 'fatuous' and we must agree that they are unconvincing.
 
 
 27
 Appellant's arguments rest upon several mistaken notions. Hi-Ridge attempts to assimilate the standards relating to standing to sue in obtaining judicial review of an administrative decision with those relating to internal administrative appeals. The Department of Agriculture could reasonably read the 'aggrieved' provision in its own regulations as qualifying the second high bidder to take an appeal. While not having a vested legal interest, Double Dee had a sufficient stake in the outcome to merit an opportunity to argue for a different decision. It is more likely that the revision to the term 'adversely affected' was intended to clarify the meaning of aggrieved rather than to change the standard for an appeal. Moreover, we fail to see to whom the appeal provision would apply in a timber auction context if not to another bidder. Cf., F.C.C. v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940). Hi-Ridge cites cases such as Perkins v. Lukens Steel Company, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940) and Edelman v. Federal Housing Administration, 382 F.2d 594 (2d Cir. 1967) for the proposition that prospective or unsuccessful bidders a government contract do not have standing to sue. The issue raised in this case by Hi-Ridge, however, is whether a disappointed bidder has the right to an administrative appeal. There is no legal principle which prevents an administrative agency from allowing a broader range of appeals than are permitted in the federal courts. In fact, Perkins and Edelman tend to foreclose Hi-Ridge's claim for relief instead of furthering it. Hi-Ridge attempts to turn the force of these cases away from itself by characterizing itself as the 'successful' bidder and Double Dee as a 'prospective' or 'unsuccessful' bidder. Hi-Ridge was the successful bidder only according to its own standards. The regulations and affidavits clearly show that no binding contract is formed in a timber auction until the award is approved by higher officials. In contract terms, Hi-Ridge's designation as high bidder only placed it in a position of offeror, a point conceded in its brief (Ap.Br. 22). Appellant tries to bridge this gap by creating a concept previously unknown to contract law-- an 'informal' contract.
 
 
 28
 In view of our resolution of the reviewability issue, we decline this opportunity to discuss the difficult standing questions raised by Perkins, supra, Scanwell Laboratories v. Shaffer, 424 F.2d 859 (D.C.Cir. 1970), Association of Data Processing, etc., supra, and Barlow, supra.
 
 
 29
 Appellant's other contentions are equally without merit. There is an allegation of discrimination but not cogent statement of facts tending to show any invidious or capricious treatment by the Forest Service toward appellant. At most, the facts show that there was an innocent oversight in failing to appraise the transportation to the south, as well as to the north. This is precisely the reason for which a rebid was called.
 
 
 30
 Finally, the summary judgment was proper because there was no genuine issue of fact.
 
 
 31
 Affirmed.
 
 
 
 *
 Honorable William P. Gray, United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 There is a dispute among the parties as to Hi-Ridge's willingness to sign the contract. Appellant Hi-Ridge claims in its brief (Ap. Br. 18) that:
 'The plaintiff has always been and is now ready and willing to sign the then existing sample contract. If it is the law that such contract places a legal obligation upon the plaintiff to build certain roads, then it will have to bide by that law.'
 Forest Service officials claim this was not the case. In his affidavit, Walter H. Lund, Assistant Regional Forester stated:
 '4. On July 3, 1963, Mr. Bendix (a Hi-Ridge representative) visited me in my office in Portland and * * * said he would not sign the timber sale contract unless the 1.8 mile road construction requirement was deleted from the contract.' (C.T. 51)
 A similar assertion is made in a letter from the Chief of the Forest Service to the Regional Forester which is dated July 22, 1963. (C.T. 45)